May it please the court. This case of course involves the Americans with Disabilities Act, which differs from most of the discrimination statutes in that it has both a proscriptive and a prescriptive function. If an employee is disabled, the statute proscribes discrimination based on the disability, but also prescribes that certain things be done, such as the granting of reasonable accommodations. We of course saw that after the passage of the overall statute, especially on the public accommodation provisions of the statute that required installation of restrooms and the changing of curbs on the streets. In the employment context, it is that reasonable accommodation function. So the two issues that are presented by the Supreme Court . . . Can I ask you why this wasn't an FMLA case? Because that's kind of how it reads. Because there weren't 50 employees. So are you trying to take an FMLA case and make it an ADA case because of that, because the FMLA doesn't apply? Because that's really how the whole thing reads. Well, actually, this is actually an issue, I have to say, that comes up in a fair number of my cases. You have the overlap between the FMLA and the ADA. We cited in our briefing the EEOC's enforcement guidance on the ADA, and it talks about the overlap between the two statutes, that you're going to have a certain number of cases where both statutes may apply or one statute may apply. For example, in the FMLA context, it covers things such as maternity leave and things like that that aren't even disabilities. And what the EEOC says, it explains, and there's case law that goes this way, too, that medical leave, of course, is an accommodation. If you . . . the obvious one, if you need time off for surgery, that's obvious. But also, sometimes it's going to be for purposes of diagnosis, for purposes of ongoing treatment in respect to a disability, that that is both a reasonable accommodation under the FMLA and it can be leave under the . . . I'm sorry, I said that wrong, a reasonable accommodation under the ADA and a leave under the FMLA. But different rules are going to apply. In the case of the FMLA, you have an absolute right to 12 weeks of leave. And there's no . . . except for the situations involving key employees, which is an exemption within the FMLA. The employer has to grant 12 weeks, whereas in the case of the ADA, you have a different standard, is it a reasonable accommodation, and can the employer show undue hardship. So there could be a situation, for example, in Mr. De LaValle's case, where the employer could show that granting a leave is not a reasonable accommodation because it would pose an undue hardship, and that could happen, it does happen. And furthermore, the FMLA can extend beyond 12 weeks. There's a number of cases where this comes up, not indefinitely, I mean, I've never seen a case where a court has said you can have forever off. But there have been cases where fact issues have been found with leave of as much as a year, because the nature of the business is such that having that employee gone for a very long period of time poses no undue hardship. For example, if we're talking about a general laborer . . . I wouldn't want to be the employee that no one thinks they need for a year. Yeah, I hear you, and I would not want to be the attorney, to be honest with you, arguing for that. But there are people out there who have done it, because I've read the cases where courts have found, and other circuits have found, that very long periods of time can be leave that would be covered by the ADA. So yes, you're absolutely right. I mean, if this company had 50 employees within a 75-mile radius, which is the standard under the FMLA, then Mr. de la Valle would have been covered by FMLA leave. But he was not. They did not. And so it is an ADA case, and the question simply becomes, is medical leave a reasonable accommodation? Okay. My concern is really more fundamental than whether, as a theoretical question, it could be an accommodation to grant somebody medical leave. Here, it seems rather as if this guy had his email correspondence, I need to do some testing, you know, do what you need to do, and then he's just gone, and no one knows where he is. And so we have this kind of lost week, where he says, they knew where I was, but then he says, I can't say I called, I can't say I talked to anybody, I can't say I emailed, and so he just disappears. That seems very different from an accommodation, where you go, okay, look, I'm going to need to be off the next week, because I've got to go get all these tests and this and that. And so I don't, I'm not even sure that we get to the legal question of, is this an accommodation that's reasonable and all that, because do we even have the facts of him really asking for it, other than just saying, I need to go get testing, and then just disappearing? Well, the fact that that is all you need under the statute, again, there's, as I think we've seen in most cases, an employee does not expect to be a lawyer and say, I need a reasonable accommodation. You don't have to use legal. No, but does he, okay, so he says, I need to go get testing, you know, do what you need to do. He goes and gets the testing, and then he just disappears. I mean, there's no, could he have been gone for months, and never called, and never said anything further but that one email exchange, and that would have been good enough? It seems kind of strange to me that that's, I'm not expecting him to use the buzz phrase, but doesn't he need to do more than just have an email exchange and disappear? Of course, the evidence, first of all, I agree with that, but the evidence in this case, though, is that at the very least, it's a fact issue. What Mr. DeLaval testified was not only did I talk to them, I talked to them virtually every day. But then he couldn't, when he was asked, did you call on the 19th, did you talk on the 20th, I don't know, I don't know, I don't know, so there isn't even any evidence from him. Yeah, I called and left a message, or I sent an email, and maybe it got lost, I mean, there's nothing from him that we can grab onto and say, if we believe that, then we would find that he did something the company didn't accommodate. Well, he couldn't give you a specific date. That's, you know, you think about that, that's unfair, I mean, what did you have for lunch last Wednesday? What did you do at a particular time? When you're asked at a deposition, what did you do on this specific day? Yes, but people will routinely say, I can't say it was the 19th or 20th, I can say it was every day, I may have missed one day, but I know I called every day. He didn't even really say that, he said, I don't know about the 19th, I don't know about the 20th, I don't, you know. And this isn't just any day that I'm having lunch. If I'm having lunch and that's going to matter, then I am going to remember what I had. You know, whereas if it's just an ordinary day and then three years later somebody wants to know, then of course it isn't going to matter, but he knows this matters, he's missing work. People know when you miss work, people want to know where you are. That's not that hard a standard. Well, he gave, he nonetheless gave very specific examples, for example, saying I was about to go in for my CT scan when they called me, and I said, I'm going in for a CT scan. I mean, that's... All right, now, where is all this medical evidence of what he was doing that week? Well, what he testified was that he gave it all to them, they scanned it into the system, and that he provided it all to them. But where is it, like now? Where can I go to find it? I don't believe any of it ever got put into the record. Okay, and isn't that a problem? Because we can't just imagine that there's this scan thing somewhere that nobody has, and what might it say that would show that, okay, after they fired him, they said, if you give us some medical substantiation, we'll unfire you, okay, that would have solved your problem, you wouldn't be here. He says he gave it, they say they didn't. We don't have the it to say, oh, wow, man, if there's a fact issue about whether they got this, and if they got this, this really shows that they didn't accommodate him. Where is it? Well, as I said, we didn't put it into the record in this particular motion. What we put in was Mr. DeLaval's testimony that he did it. Our burden was, of course, just to raise a fact issue. Well, counsel, let me ask you about discovery in this case. It did seem that Judge Hughes had everybody on a fairly tight leash on this. Did you seek discovery of these scanned medical documents that your client says were produced and he no longer has, I guess? I don't know if he ever . . . Do you ever assert that he no longer has the records? I don't . . . I don't . . . To be honest with you, I don't remember off the top of my head what Judge Hughes allowed and did not. As you may have seen in past cases and in this one, he tells you what you are allowed to have. Well, was discovery . . . Was there a discovery deadline and that had passed? No. He hasn't set discovery deadlines. Okay. But at the time, in summary judgment, at least, motions were considered to be proper. He certainly considered this one in a way you wish he hadn't considered it. So at least the issues were considered joined and I didn't see any Rule 56 subpart motion saying it should be delayed for more discovery. So we had the package of evidence in front of Judge Hughes that was considered to be the full range of evidence. He did somewhat, on his own initiative, rule on both claims when your initial motion only raised the discrimination claim, but I think procedurally that may have been fine because of your opportunity to respond in asking for reconsideration and offering new evidence. So I think we have . . . the question in here . . . I'm sorry, this is more a statement than a question. The question in here is, do we have in the summary judgment package all the evidence legally that is necessary to consider? Because there had been no motion saying more discovery or anything else was necessary before a ruling could be made. Well, I felt and continue to feel that the evidence we have that is here before you . . . which is Mr. DeLaval's specific testimony about how he informed the employer of what was going on and that he did provide his medical records to the employer . . . that that by itself is sufficient to raise a fact issue, which is what we have. Now could there be further evidence developed down the road? Of course. We could get into computer forensics and things like that to find out what happened to these particular records. I didn't and don't think that that was necessary to raise a fact issue as to whether he provided the records. He could say, I did it. And he did very . . . Yeah, but I did it and we don't know what it is. We don't know if these records would have shown medical testing from January rather than the relevant days in March. We don't know what he gave them. So how can we say that the it shows that they were, you know, discriminating because once they got it, they should have said, oh my gosh, we made such a huge mistake. Of course you were getting testing. Of course we should have accommodated you. Please come back and we're sorry, which would have ended the matter. But they wanted to take that position certainly, for example, that he did provide evidence that related to something from January. They could do that, but with the specific issue . . . No, no, no. You're the one who asked to raise the fact issue. You said you raised a fact issue by saying I gave them a disk. But what I'm saying is I don't know what's on that disk and I still don't know what's on that disk and you said there's nothing in the record to show me what's on that disk. So how can I say that raises any kind of fact issue? Because he told you what was on the disk and this, again, this is a summary judgment setting. Is it sufficient to raise a fact question? And what he said was I provide them every medical record for my testing. I included, he keeps referring to the band that he had on his, I think he says his shoulder. I guess this hospital puts something on your shoulder when you check in, which sounds unusual. I'm usually used to seeing the wristband, but he described it as a shoulder band. But he said they made copies of all that stuff and I brought it all into them. Now, I certainly was not placed on any sort of notice that that portion of the evidence was going to be insufficient. That wasn't something they argued. They simply argued he never talked to us at all. It wasn't, for example, they raised an issue that what he provided to us was not sufficient to raise the issue of where he was and what he was doing. If they had raised that, we would have been approaching this somewhat differently. But instead, what their position was, he told us nothing at all. Well, counsel, let me ask you about the initial decision, the only one, by Judge Hughes, but you could have filed a motion after he ended this decision. He says since March 27, 14, Delaval has not produced a doctor's note report specifying the test he took, his condition during his absence. Now, he's in part, well, let me go a different direction. Isn't that putting you on notice that this package of evidence I am looking at, what is relevant here to me is that there's no medical information showing that he actually did, your client, what he said he was doing? Couldn't you have filed then if you had the evidence or asked for more discovery and filed for a delay in summary judgment? I mean, none of that happened. So it concerns me that you're saying there could be and may well be such evidence, but he didn't offer it if he kept the documents. You didn't ask it for it from the government, whoever is sitting on that table over there. And they just look like the government from this angle, maybe from the employee's viewpoint. So it seems to me procedurally, this is a difficult case for us to say that you made a fact issue when you really had opportunities to come up with this evidence and didn't offer it. But I can tell you factually that his opinion did not put me on notice of that. I can tell you that much. Whether it may, perhaps it should have is a different matter. But I can tell you in the real world it didn't because what I had, what I felt was sufficient, still feel is sufficient, is that Mr. DeLaval's very explicit testimony. For example, do we really need these medical records when Mr. DeLaval has testified? Give us an example. You know, I got a phone call one day from them and they said, you know, I told them where I was. Can you, when you come back on rebuttal, can you give us the site for this part of his deposition or affidavit or wherever you're saying he said this thing about the records and what he said about them? Absolutely. I'll be happy to do that. The, but I guess that's the, you know, at this point that is the, the way we would suggest the court approach the issue simply. This is a, the specific issue that was raised was by, by the defendant, by PTAC was, we never heard from him for a week. That was the pitch they made. That's the argument they're making. We didn't hear from him a week and therefore he came back and we fired him. And what we, what I countered, the evidence I presented to counter that was about Mr. DeLaval testifying. I was in touch with him every day on the phone, which he testified. He gave one specific example that when he was going in for a CAT scan or a CT scan that he was, that he got a phone call saying, hey, I'm going into a CT scan. We, we showed that, that, you know, Mr. Dallas had said, go get all the tests you need. This could be kidneys, it could be appendix. He testified, I brought in all the medical records. The issue, as it was framed, as I understood it in the trial court was not, prove these records exist, show us what these records are. If that had been the way the issue had been framed, of course we would have put some of those into the record. I didn't understand that to be the fact issue and I don't think that's the way it was framed. And I think Mr. DeLaval's testimony hid his affidavit, all of which we've shown you, shows that he was not MIA for that week. But that he did keep his employer informed of where he was. In any event, even if all of that's true, they have, they still, it would be their burden to show that him being gone for a week was across an undue hardship on them. Because he'd been granted the accommodation to take it back, they would have to show him being gone for that week rises to the level of an undue hardship. And that's their burden of proof that he didn't need it. Thank you. Thank you, counsel. I found the record site, by the way. It's 209 to 210 is his deposition. You're not here for the government? I've been called and responded to worse, Judge. But I'm not here for the government. Okay. May it please the court, Steve Griffith on behalf of P-TECH Drilling Tubulars, the appellee in this matter. Excuse me. I think the panel's observations right at the beginning were really on point. Although this case is interesting and certainly not as uncomfortable as the last one, this is not an ADA case. This is a case about an employee that wanted to take a day off of work in order to have some tests run, and then fell off the radar entirely. Fell off the radar for an entire week. If we look at the actual evidence in the record, we see that on March 14th of 2014, Mr. Delaval requested a day off so that he could go have some tests run. Is that really what he requested? I know you have a break in your train here. I bet you can get back on the track. But what he heard from the president, I think is the title of this person that he was talking to, Mr. Dallas, that here are my medical situations. The response is, do what you need to do. I see that as at least a fact question. It's an open-ended offer to take care of his medical problem. He says in his statement that's in the evidence that he provided proof to your client that all these procedures and visits actually occurred. Don't we have a fact question right now about whether he had permission from Mr. Dallas, at least on the discrimination side is what I'm talking about, that he had permission from Mr. Dallas, and that, in fact, he says these records were provided. We don't have them yet, but that does not create a fact question. Respectfully, Judge, it does not, and you've raised two issues. So let's talk about the email first. The email correspondence with Mr. Dallas, who is the owner of the company, is on, what, the first email is on March 14th, and then the second one is on March 18th. And what it says is, great news, I went and had a test on Monday, the 17th, and I don't have cancer. So he has a test on Monday, doesn't show up for work on Tuesday. Tuesday afternoon, emails Mr. Dallas. The email's on page 192 of the record. Says, great news, I don't have cancer. I've been referred to a GI specialist for additional tests. Mr. Dallas responds on Tuesday the 18th in the afternoon and says, that's great. I've got a history of cancer in my family. I was concerned about that too. Do what you need to do, as paraphrased earlier, but what's more important, I would suggest, is that it says, just keep us informed as to what needs to be done. Good luck with this and keep us informed. And after that date, not later on the 18th, not on the 19th, not on the 20th, not on the 21st, not over the weekend on the 22nd or 23rd, or on the 24th. Is there any evidence in this record of a single communication to P-TECH? Not a single one. And Judge Haynes really zeroed in on one of the things that was interesting about the testimony that was cited in the brief. The testimony in the brief is that Mr. Delavalle was called on a daily basis. But then something interesting happens in the deposition. This is not quoted in the appellant's brief. Ms. Smith asks Mr. Delavalle, this is page 88 of the record. This is right after Mr. Delavalle said, I was calling daily, I was talking to Edwards, I was talking to Trimble. Ms. Smith says, I think we're talking about different time periods. So I'm gonna get something to help with that. I wanna make certain we're talking about the last leave in March of 2004. Not times in January or February where you were making these calls. I'm talking about the last leave from March 18th through March 24th when you were out of the office. Are you saying that you were making these calls between March 18th and March 24th to someone at P-TECH on a daily basis? His answer is, well, they were aware of my medical condition. And Ms. Smith follows up and says, my question is different. Were you talking to anyone on a daily basis? And he says, I'm not sure on a daily basis. And so then she follows up again, what about the 18th? What about the 19th? What about the 20th? What about the 21st, the 22nd, 23rd, 24th? He says no to all of those. I don't remember. I don't know. And then we have the evidence in the record from Mr. Edwards, who works for P-TECH, who says that he and Mr. Trimble were reaching out affirmatively to Mr. Delavalle during all those days, and he was not responding. He wasn't returning voicemails. He was totally off the radar during all those times. Now the second question had to do with- Can I ask you, well, I'm sorry, you're going to get to a question that was raised by my colleague, or? Well, I was, but I'll- Well, I guess what I'm wondering is, do y'all think he was getting testing, or you think he was out on a lark? I mean, to me, it seems funny. I know he should have called and all that, but if he really was getting testing, then it would seem like you'd go, you know, don't do that again. Call us every day, or whatever, and you'd take it back. I don't believe he was getting testing. So y'all really think he just kind of was using this as an excuse to take a bit of a vacation? I absolutely believe that, and here's why. When he comes back to work on the 25th, Mr. Edwards says to him, and Mr. Delavalle even acknowledges that there was a request for doctor's records. Give us a copy of the doctor's records that show that you were out. He's not terminated that day. He's terminated on the 27th. He's got two days to come up with anything. And Mr. Delavalle says, I produce all kinds of information. This is page 89 and 90 of the record. It's in a couple of spots because it's from his deposition. But he says that he provided a stack of paperwork regarding prescriptions, and wristbands, and appointments, and all these medical records. Well, he also testifies that it was handed to April Grayson, who scanned it into HR and put it into his HR file. P-TECH has no record of any of that ever happening. P-TECH has no record of any medical record whatsoever. What's telling to me though is the very next question after he says he did this in his deposition is on page 90 of the record. And you kept a copy of all that yourself? And he says, absolutely. He separately says on page 210 of the deposition that he spoke with his lawyer the very same day. Mr. Delavalle has never been able to produce those records. His lawyer has never been able to produce those records. On page 12 of the record, Judge Hughes entered an order compelling him and his lawyers to produce records regarding where he had been that week. Nothing was ever produced. Okay, so even if he lost it though, the doctors should still have it. And you're saying he should be able to go fill out a HIPAA form or whatever they're called and get his records, and he never did. That's exactly right. And in fact, Judge Hughes' order on page 12 of the record went a little bit further. It says, produce the records. It doesn't say, produce what you gave P-TECH. It says, produce all the records that relate to this. He was under an obligation from the court to go get all of the records, not just what he provided to P-TECH, all of the records. So if there was something there, they should have either had it or gone and gotten it. And then at least we'd have something to look at and go, okay, he was at this doctor, he was getting a CT scan, whatever, whatever. That's exactly right, Judge. And what you've done with that comment is really zero in on the real issue in this case, we would submit. The touchstone of an ADA claim, a claim under the American with Disabilities Act, is that there is a disability at issue, that there is a disability at issue. The only document of any kind in the entire record, you can scour every page, that suggests anything related to a medical condition with Mr. Delaval is on page 189. It's a summary of a progress note from Dr. Javerman, I probably mispronounced that. But it talks about an office visit in April of 2014. This is almost four weeks after he was terminated from P-TECH. It's a two-page summary of progress notes, a couple other comments that are relevant at an overarching level. This is only submitted into the record, page three and four of seven from this particular doctor. Pages one and two, and pages five, six, and seven are not submitted. We don't know, in this record, it's totally silent what those pages were. Even more telling, this record, the only record in this case, regarding any medical treatment for Mr. Delaval, was created, if you look on the second page, in March of 2015, a year after he had been terminated, a year after the adverse employment action. So whatever's in this document couldn't possibly have been considered by P-TECH at the time it's making decisions. And then when you read the document, you find that Mr. Delaval's not in perfect health, he's overweight, he smokes too much. But in the examination, it says he's well-groomed, he's not in distress. His EENT is all clear and not crowded. He's got normal nasal mucosis, he's got no- Well, but this looks like something he printed off a portal. So, I mean, this looks like something he could have printed at any point, and it makes you wonder whether there's other stuff available on the portal. Well, you're exactly right, Judge. And if you look on the second page, just under the doctor's signature, it says that it's signed by the doctor on March 19th of 2015. So this document didn't even exist until at least that date, and I think you're right, it could have been printed from a portal. And the records about the examination also say that his cranial nerves are intact, his cardio is all fine, edema is absent. So then when you get to the second page, again, the only medical record in this entire case, the treatment is a Ventolin inhaler, two puffs as needed, and that's it. That's the only treatment he needs for this, the only one. The other thing that is prescribed here, the other procedure is a CPAP titration study. That is an overnight sleep study to see whether or not a patient needs a CPAP machine to assist in sleep. There is no reasonable accommodation necessary for either of those two things, even if a request had been made, even if this document existed at the time P-TECH made its decisions, and even if the issue had been presented to P-TECH. In fact, Mr. DeLaval simply just fell off the radar, and that's the real problem here. Now- But it's just puzzling to me. To me, this is just a mystery, why he would fall off the radar, even if he wants the vacation just to say, hey, I'm still getting tests, I'm still getting tests. I don't even understand it, from either side. I don't understand y'all's reaction, I don't understand his conduct, and I don't know how this fits in the ADA. So I find this a rather mystery case here. Well, and I can tell you, from our perspective, Judge, one of the things that we were wrestling with is that Mr. DeLaval had been a problem employee for a long time. He had been written up many, many times. All of this is well documented in the record. We identified them as part of the record excerpts, and we had made what we would consider- Did he have a problem with absences, unexplained absences? I don't recall, as I stand here- Why was he a problem? He was having problems with supervision and problems with his actual activities. I cannot recall, as I stand here, if it was problems with absences. I know that we identified it in the record excerpts, and my apologies for not being able to speak to that specific issue. But he had been a problem employee, and had been promoted up the chain, and then had to be demoted. And then actually, he was transferred to a lateral position, and they were trying to work with him in some way. And then all of a sudden, this happens, and he falls off the radar entirely. And he said, in his deposition, two things that I find very important. First, he was fully aware that under the handbook, this was an established policy, and he was not able to be out for three days. That's page 95 to 96 of the record. He also says that he thinks he was terminated, because he knew that P-TECH was incompetent, and that its proprietary software was not really very good. So he believes it was a whistleblower theory of some kind. He does not suggest it in his deposition at all. It's because of age, which was one of the claims brought below, or because of disability. And he's so sure that he says he's 100% sure about that. Now, it's perfectly consistent with the ADA, the regulations, and the EEOC guidance, and even this court's jurisprudence, to require that any plaintiff, plaintiff is the one with the burden, that any plaintiff to succeed on a claim, be able to identify the impairment, X, and the major life activity, Y, that is impacted by it. If the court reviews Griffin to UPS, Judge Stewart dealt with this issue, where an individual had diabetes, and alleged that it affected his ability to eat. And the judge said, well, or the panel said, well, diabetes is certainly an impairment, and eating is certainly a major life activity. But without some nexus between the two, without some evidence between the two- What we know is, lay people, that COPD impacts breathing, and isn't breathing a major life activity? Breathing is definitely a major life activity. Do we need anybody to tell us that, or can we just know that as people? I would suggest, Judge, that we do need to have some evidence, certainly in a case like this. I can imagine scenarios, an amputee, for instance, or somebody who's a paraplegic, where it's not required to have some type of formal diagnosis. And it's not our position, as suggested by the appellants, that there has to always be a formal diagnosis. Although, I do think there would be some support for that under the ADA. Here, there hasn't even been an identification of the impairment. At this point, as of today, Mr. Delaval still does not know, and cannot tell this court, what he believes is wrong with him. The COPD information, the first time that it appears anywhere, is in the doctor's note that we just looked at, that's prepared a year after he's gone. Hindsight is 20-20, but at the time, P-TECH has no suggestion from anyone that he's got COPD. No request from him about being off, no suggestion that it's impacting his work in any way. None at all. I might say, just in his defense, because you're not here to defend him, if I had gotten the emails that he got from the owner of the company, I would have felt that I could, and assuming that he has got a health problem, that I had blessing to be gone three days. And that was a very generous series of emails from, apparently, the owner. I think he felt he had permission. And I think your Honor's observation is a fair one, in a lot of ways. I think at the time, because he had been out with no contact, respectfully, it was not three days, it was for an entire week, with no contact at all, after that same set of emails said, keep us informed, keep us informed, that's where the concerns arose. And then when he came back, he was not terminated the first day. He showed up on the 25th, and he was not terminated that day. He's asked for the medical records that would have supported him. We asked for the medical records that would support that, and after two days- And then he says he gave them to you. And now you say they don't have them. And he doesn't have them. That would not be your first client that didn't have them. No, well, that would be true, but the plaintiff, when the plaintiff says, I gave them and I have a copy, and then the plaintiff can't produce them. And in order to do so- And in order to do so, not just produce what he gave P-TECH, but actually in order to produce the original records from the medical providers, and doesn't do that either. I mean, at this point, as we stand here, the only reason we have to believe that Mr. Delaval saw a single doctor that entire week is because he said so. We have no document in or out of the record that suggests he actually saw a doctor during that time frame, none at all. And so that, Your Honor, raises a fair- But you're saying the fact that he said that he did that doesn't create a fact issue. I don't believe it does, Judge, particularly in the face of requirements under the ADA. I mean, even the EEOC guidance that opposing counsel cites, and I'm glad you raised that question because it raises two issues with this guidance. First, there's a suggestion that the ADA requires a leave of absence as a reasonable accommodation. And the text of the ADA actually does not say that at all, and the regulations under the ADA do not say that at all. There is a reference to a modification of a work schedule in the regulations, and most courts, in fairness, do acknowledge that a leave of absence could be provided as an accommodation. But the language in the EEOC guidance that was quoted in the brief was incomplete. The brief says that the EEOC guidance provides that obtaining medical treatment, period, could be grounds or could be a reasonable accommodation. In fact, the guidance, and this is on page 13 of that guidance, it says an employee with a disability may need leave for a number of reasons related to the disability, including but not limited to obtaining medical treatment, open parentheses, e.g., surgery, psychotherapy, substance abuse treatment, or dialysis. The ADA does not protect or provide leave to determine whether you have a disability. It would be circular for it to do so. The ADA does not allow an employee to compel leave as a reasonable accommodation to see if they have a disability. Well, let me get back to the exchange you had with Judge King, because I think it's important. So he thinks, perhaps reasonably from the email exchange, look, go deal with it, go get your testing. So he goes kind of off the radar or whatever, so everybody's freaking out, where is he, comes back and he says, I was at the doctor. And they go, great, well, we require substantiation of that since you never called us, give us a substantiation. That in itself is a reasonable request. And so whether or not his testimony that he went to the doctor would create a fact issue of whether he went to the doctor, the question of whether there's substantiation that would support their decision to say that's an unexcused absence because you didn't give a substantiation is a different question, and one that he's had now years to fulfill. And even as we sit here, we don't even have any knowledge of any doctor report of any kind for that week. So whether or not he went to a doctor and said so, to me, isn't the question. The question is, was it reasonable for the employer to request some substantiation of that before, you know, overlooking these absences, you know, these AWOL days? And I think it is reasonable, and then therefore, even if we had a fact question about he gave the records, but they lost him, we should still have the records, and now we don't. I agree completely, and the EEOC does too. I mean, the EEOC in that same guidance says that an employer can require production of records that support the fact that there's a disability and a functional limitation as a consequence of it. Because remember, those are two things that have to be shown. It's not enough to have a functional limitation. I suffer from a lack of sleep, but I've got a 7-year-old and a 3-year-old. I'm not disabled because of that, but if I'm losing sleep because of depression, perhaps. If I have a doctor that says I'm losing sleep because of it, perhaps. If you have COPD, you'll lose sleep. That's absolutely right, and Judge, I don't mean to make light of the condition. It's a very serious condition. At the time Mr. Delaval shows up for work on the 25th, he doesn't mention it. There's no record of it. On the 27th, when the decision to terminate, there's no mention of it. There's no record of it. It's not until a year later that the first record shows up in that regard, and it would have been nonsensical for us to say he never gave us anything because that's so easy to disprove. He could have said, well, here's a copy of it. Our position has always been he never gave us anything, and he could have easily disproved us at any time. I see that I'm out of time. I appreciate the court's inquiries, and we respectfully request that the district court's grant of summary judgment be effected. Please, court. I can tell you honestly, I do not remember, as I stand here today, what we produced in discovery. Judge Hughes did require us to obtain medical records in producing discovery. So you're telling us that this week that everybody's so focused on, that there's some dispute about what he was doing for, you don't know if there are records for that week? That's not what I'm saying. I have a recollection of obtaining records. And what counsel just told you is that I didn't produce them in discovery. As I sit here right now, months later, without my entire file, I can't remember specifically what I produced. But what I can absolutely tell you is that if I hadn't produced those records, if there was no proof that he went to the doctor, we would have heard about that, the summary judgment motion. They would be saying, oh, he must have been on a lark. He has no records. He cannot produce anything. He can't tell you who the doctors are, yada, yada, yada. If I had not been able to show that at the time, we would not be hearing about that for the first time today. Because they do not take the physician in their briefs that there is no evidence that he ever went to the doctor. They don't say that in their briefs. They say, rather, that there's no evidence that he told us at the time where he was. They don't say there's no proof. But I'm somewhat stunned by the idea that you have to guess that there probably are records that you turned over. Because I don't care whether he had records from, you know, the judge required ten years' worth. And I can imagine you might not remember 2005 he went to the dentist or something. But this is the key week. This is the whole case is the week of March 18. And you don't know if there are records for that week? I do know we produced records. But I cannot tell you from my personal recollection as I stand here what those are, because I did not understand that to be an issue. If the court wishes me to supplement on that, I can do that. No, I just, to me that's just shocking. Because that's the whole case. The whole case is that week. Well, I understand that. But this case is decided on the summary judgment record. And in the summary judgment record. And you would have been the one to put that in the summary judgment record, that yes, here are the records that my client gave to the P-TECH that they have now conveniently lost. That's exactly how it would be worded. I promise you I've seen enough of them. Okay. But at the same time, if there were no such records in discovery, which is what counsel is suggesting, I certainly would have expected to have heard that in their motion, which I would have responded to. I would have expected to see it in their brief, which I would have responded to. I certainly wouldn't have expected to hear that for the first time in oral argument that we didn't produce any of those records. Again, I can't tell you from my, I cannot honestly tell you that I know from off the top of my head what we produced in discovery. But I do remember that we obtained medical records. And I'm fairly confident that we did. But I'd be lying to you if I told you that I had a specific recollection of that. The one thing I wanted to cover was, and we talked about this a little bit in the brief, was the comment that Mr. de la Ball said there may have been other reasons why he was fired. Well, of course, if Mr. de la Ball were to come in and say, in my opinion, I was fired because of my disability, you would say that's incompetent testimony, and you'd be right. This comes up in any number of cases. You can't raise a fact issue as to race discrimination or sex discrimination or whatever by saying, I was fired because of my race or sex. The flip side here is he may have other beliefs about why he was fired. His subjective opinions don't matter. This is actually a direct evidence case. He was fired for missing time when he was, as far as, prior to today, I've heard no dispute that he was missing time for medical records. I've heard no argument that he was on a lark. That is brand new today. The argument was he didn't provide us with adequate notice. But anyway, with that, I thank you for your time. It was vigorously argued on both sides. We appreciate your helping us understand this case. We'll take a brief recess.